[Civ. No. 19463.   First Dist., Div. Three.   Feb. 8, 1962.]

GEORGE W. McANULTY, Plaintiff and Appellant, v. MIKE LEMA, Defendant and Respondent.

128

Sills & Sills and John M. Thorpe for Plaintiff and Appellant.

Plotner & Rodriguez and Vernon A. Moore for Defendant and Respondent.

DEVINE, J.—Two separate transactions in the sale of Christmas trees are the subject matter of this litigation, the first giving rise to the complaint by the seller to recover the purchase price on one lot of trees, silvertips, and the second being the source of the cross-complaint by the buyer for damages for breach of implied warranty of fitness on the other lot of trees, white firs. It was admitted by the buyer, Lema, at the trial, that the entire amount of $1,548.80 was owing on the silvertip sale, those trees being wholly satisfactory, and judgment in that amount was stipulated. The issues in the case are those raised by the cross-complaint and its amendments and by the answers thereto.

Cross-complainant Lema was a trader in Christmas trees in Oakland, California. In 1957, he paid McAnulty, a wholesaler of trees in Oregon, $6,380 for 3,500 trees to be cut and delivered to Lema at Klamath Falls, Oregon. By the terms

of a letter from the seller, the buyer had the right to "reject any tree not suitable for the market." When Lema arrived in Klamath Falls, he found the trees frozen together, and he could not use the right of rejecting individual trees, but had to load the lot and bring it to Oakland, according to his testimony, which we accept because he is the respondent. Lema testified that when the trees had thawed out in his lot in Oakland, he found the whole lot to be culls, that he sold but 400 or 500, and that the rest were unsalable because they were one-sided, crooked, and lacking in branches and needles. The unsold trees were hauled away by a scavenger, at Lema's expense. Lema testified in his deposition, which was received in evidence on offer by counsel for McAnulty, that a police officer, whom he designated as "captain of the investigation of the police department," told him not to sell the trees or it would ruin his business, which Lema testified he had conducted at the same corner for 24 years. A retired professor of forestry at the University of California, who was an expert on Christmas trees and a writer on the subject, visited the lot on January 9, 1958, inspected some 25 or 30 samples individually, taken at random, walked around the pile and saw the top trees all the way across, and said that the trees were of very poor quality.

Two conversations between the parties are now related because they are the ones which must be relied upon by cross-complainant, the buyer, to establish notice of breach of warranty. The first occurred on December 8, 1957, when Mc-Anulty, having been asked by Lema to look at some of the trees, visited the lot and Lema brought him to the pile, and McAnulty, after pulling 50 or 60 trees from the pile, said, "Mike, I didn't think the trees were that bad. I had bum cutters." Lema asked, "Why do you want to hurt me for, George?" and said, "George, you're the man that sold me these trees." Lema testified that McAnulty said, "I got 240 trees on the truck" and "I'll give you to help make up for some of these bad ones." Lema promised to pay for the admittedly good silvertips in about 10 days.

McAnulty gave Lema 240 trees which were on his truck, but McAnulty testified this was because he was in a hurry to return to Oregon because of illness of his wife and he gave the trees to Lema for that reason and not to make up for defective ones.

Lema was asked, at his deposition, if he discussed a refund, or intended to get a refund, at the time of the December 8th

conversation. He answered that he did not discuss refund, and as to his intention, ''[Y]es and no. I never had it in my mind to hurt the man because I figure that if he was any kind of a man and he saw—When he gave me the 240 trees, he saw his mistake, and I figured, well, he'll make it up some way or another.''

The second conversation occurred early in January, 1958, when McAnulty telephoned to demand payment for the silvertips. Lema said he was ready to pay, but that McAnulty was ''in big trouble,'' that the trees were ''condemned'' and that McAnulty would have to come down and ''straighten out'' on the trees other than the silvertips. McAnulty said that was ''water underneath the bridge.'' McAnulty testified that he didn't know what Lema meant by ''straightening out'' but thought Lema might be trying to talk him out of some money because there had been a surplus of trees.

No further communication between the parties appears in the record. On February 21, 1958, McAnulty filed his complaint for $1,548.80 in the municipal court, and on May 26, 1958, Lema filed his answer and cross-complaint for $8,750, thus causing transfer to the superior court.

Notice of breach of warranty was not pleaded in the cross-complaint, nor is it mentioned in the pretrial order. At the close of cross-complainant's case in chief, cross-defendant moved for nonsuit, pointing out the lack of pleading and of proof of notice of breach of warranty. This was denied, the court stating that an amendment to the cross-complaint would be allowed, and at the end of the trial the court permitted an amendment to the cross-complaint to allege that ''within a reasonable time after discovering that said trees were unfit for the purpose for which they were intended and required, defendant made known to plaintiff that said trees were not, in fact, suitable for said intended use, and of the breach of warranty of fitness for which the trees were purchased.''

There was no answer or demurrer to the second amendment to the cross-complaint, and perhaps no opportunity was given for pleading to it, but a motion of the cross-defendant that the pleading be stricken was made. This motion apparently was never ruled upon. It would seem that the court regarded the amendment as one to conform to proof, and considered the allegations denied.

Counsel for cross-defendant desired to present, as one defense to the warranty claim, custom and usage which negatives

breach of warranty of fitness for purpose sold of Christmas trees, and the court, deeming an amendment to the answer to the cross-complaint necessary to that defense, allowed an appropriate amendment, which was filed.

Appellant's first contention is that there is not substantial evidence to support the judgment, but we need say no more than that the acceptance of all of the evidence favorable to respondent amply sustains the judgment.

■ Appellant's next point is that the court ignored custom and usage which, appellant says, negatives warranty of quality of Christmas trees, because of their perishable marketability and the impracticability of making replacement at a distance, the buyer being required to reject unsuitable trees at the place of sale. Appellant contends that the court's slighting of this defense consists of (a) failure to make a specific finding on the subject, and (b) refusal to allow cross-defendant himself to testify on the subject (although witnesses produced by him did testify).

Section 71 of the Uniform Sales Act, which is part of the law of California (Civ. Code, § 1791), and of Oregon, the place of sale (Ore. Rev. Stat. § 75.710), permits any duty or liability which would arise under a sale by implication of law to be negatived by custom, if the custom be such as to bind both parties to the sale.

The court, after hearing evidence on the subject of custom, found that there was a warranty, and although the court made no express finding that there was no custom which would negative warranty, such a finding is implied.

The court in its memorandum opinion mentioned the subject of custom and usage as having been pleaded by amendment to the answer to the cross-complaint, indicating that the court had the subject in mind at the time judgment was rendered.

The court, as stated in the memorandum opinion, accepted the testimony that it would be difficult, if not impossible, to inspect frozen trees at the point of delivery, and made a finding that no opportunity to inspect was afforded "due to the condition and circumstances of the trees." We infer that the court did not deem existent a custom negativing warranty where inspection was not practicable. The failure to make a specific finding we regard as not prejudicial, if error at all.

■ The point of the alleged refusal to allow plaintiff to testify on the subject of custom and usage is of no merit. There was no offer of proof, and the question put to cross-

defendant by his counsel, which cross-defendant contends he should have been permitted to answer, ''Can you [McAnulty] point to any fact from which you knew that Mr. Lema knew that there was no warranty?'' obviously called for the conclusion of the witness about the conclusion of another witness (both being the parties to the case) and properly was disallowed.

The subject of notice of breach of warranty is a more serious question. Here, again, the subject is divided into two parts: (a) Is the pleading of notice of breach of warranty so defective in substance, or so tardy in its presentation and filing, as to amount to prejudicial error; and (b) is there substantial evidence of notice of breach of warranty?

The pleading of notice of breach of warranty is in extremely broad terms. No allegation is made as to the manner in which the alleged notice was given, and in particular there is no statement as to the time of the alleged notice. The pleading of notice of breach of warranty was filed at the end of the trial. Nevertheless, reference to the intended amendment, and of the court's disposition to allow it, was made during the trial.

There could be but two instances of notice, the conversation of December 8, 1957, and the telephone conversation of early January. These were related fully by both parties. A large amount of testimony as to the condition of the trees was presented by cross-defendant, as well as by cross-complainant. In taking Lema's deposition, counsel for cross-defendant interrogated him about the only conversations which could constitute notice of breach of warranty. When he was asked if he would be prejudiced by allowing amendment to allege notice of breach, counsel for cross-defendant said ''no.'' Later he moved to strike the amendment, but he did not, so far as the record shows, request a continuance to meet any new matter. Amendment at trial to allege giving of notice of breach of warranty is largely within the discretion of the trial court. (*Vogel* v. *Thrifty Drug Co.*, 43 Cal.2d 184, 188 [272 P.2d 1].) We do not find that appellant was prejudiced by the tardiness of the pleading and its quite general terms.

The next question is whether the two conversations establish sufficient notice of breach of warranty. Appellant contends that the first one is deficient in substance to constitute notice of breach of warranty, that an adjustment of 240 trees was made and was not refused by cross-complainant,

and that the complaint made in January 1958, was not made within a reasonable time. We choose to discuss these in reverse order, because if the January complaint was not untimely, both complaints should be considered together in order to determine their sufficiency.

The January conversation is not expressly attacked by appellant in his briefs as to its sufficiency in substance, but as to its asserted tardiness. The period elapsing between the delivery of the trees and the January conversation is not, measured in days, very long, a few days over a month; and measured from the thawing out of the trees, about a month. However, the market for Christmas trees, of course, had terminated. It is argued by appellant that with an earlier notice cross-defendant "might have been" able to sell the trees to a third person, or might have been able to present pictures, experts, and witnesses as to the condition of the trees. It must be observed that to sustain appellant's position, we would have to hold that the notice was unreasonably belated as a matter of law. What is a reasonable time for such notice is essentially a question of fact. (*Whitfield* v. *Jessup*, 31 Cal.2d 826, 831 [193 P.2d 1]; *Webster* v. *Klassen*, 109 Cal.App.2d 583, 592 [241 P.2d 302].)

Cross-defendant did not go forward with any evidence to show what he might have accomplished had notice been given earlier (assuming at this point that the December conversation did not establish notice). The expert engaged by cross-complainant did not commence his examination of the trees until January 9th, and cross-defendant might have employed an expert at that time. His own visual inspection of the trees had occurred on December 8th, at which time he made the admissions referred to above. His testimony that he did not know what Lema meant by demanding that he "straighten out" may have led the judge to infer that he, McAnulty, was not interested in further inquiry about the condition and salability of the trees.

As to the possibility that he might have resold the trees in December, it may be doubted that appellant had the right so to do (*Whitfield* v. *Jessup, supra,* at p. 830), but, in any event, here again, we have no evidence at all, though we are asked to hold as a matter of law that the January notice was unreasonably late. McAnulty testified that because of personal problems he had to hurry back to Oregon on December 8th, and so gave Lema the 240 trees. Whether he could have resold the trees under the circumstances is a matter upon which no

proof, even that which necessarily would have gone into probabilities, was offered. Besides, the court may have believed from the evidence that resale, except as culls, would not have been possible.

As to the 240 trees, it cannot be contended that there was an accord and satisfaction, not only because there was no pleading thereof, which is necessary (1 Cal.Jur.2d 283), but also because of the testimony of McAnulty that these trees were not offered in order to make up for defective ones. Nor was there a withdrawal by Lema of the notice, discussed in the next paragraph, theretofore given, when the 240 trees were left with him.

Now, considering the December 8th conversation, we find (taking the evidence most favorable to respondent), that the buyer asked the seller to come to his lot, showed him the trees, and complained he was hurt. He was told the seller had had ''bum cutters'' and that the seller had not known the trees ''were that bad,'' and was given 240 trees ''to help'' make up for the bad ones.

No particular form of notice is required. It need merely apprise the seller that the buyer intends to look to him for damages. (*Whitfield* v. *Jessup, supra*, 31 Cal.2d 826, 830.)

It is urged by appellant that respondent did not at any time apprise him that appellant intended to look to him for damages, and that, in fact, the buyer did not know in his own mind whether he would do so at the December meeting. The answer, we believe, is to be found in the fact that the 240 trees were given ''to help'' make up. Respondent's testimony that he believed that this gesture, following appellant's admissions, was a token of further adjustment, no doubt was believed by the court. The calling upon the seller to see the trees, and the exhibition of them, the court no doubt concluded, was not an idle act on the buyer's part. He was not required to make an unconditional demand, in view of the seller's then disposition to make at least some restitution. It may well be that had some further ''straightening out'' been done, the buyer would not have pressed a claim for the entire amount.

The two conversations must be taken together. By early January, the seller had been told that he was in big trouble, that the trees had been condemned (this overstated the fact, referring to the police officer's admonition, but appellant cannot complain of some overstatement when he is asserting lack of notice of breach), and that the seller must straighten things out. Although no amount of damages was then de-

manded, since the buyer had not complained of the silvertips, upon which payment admittedly was owing, obviously the buyer was asserting a claim for damages on the defective white fir trees. A sweeping denial of responsibility by the seller may excuse a detailed statement of damage by the buyer (*Brandenstein* v. *Jackling*, 99 Cal.App. 438, 449 [278 P. 880]). When the seller told the buyer that the transaction was water under the bridge, and, at trial, professed ignorance of what "straightening out" meant, the court may reasonably have concluded that the seller was not interested in a more specific form of notice.

The case of *Arata* v. *Tonegato*, 152 Cal.App.2d 837 [314 P.2d 130], cited by appellant, is quite distinguishable. There, plaintiff exhibited to defendant beauty shop operator a rash on her scalp the day after a dye was applied, but gave no further notice, although she was hospitalized several times, underwent several operations, and claimed partial loss of vision. The mere showing of a rash, which might have cleared up, did not give notice of the very large injuries later claimed. The claimed defects of the Christmas trees were all present when the seller's attention was called to them.

Finally, appellant claims error in the matter of the amount of damages as follows: (1) that the court found McAnulty, the seller, is entitled to $1,750 credit for failure of the buyer to mitigate damages; (2) that the testimony of the expert who testified for Lema that normally 10 to 14 per cent of Christmas trees are left over on the lots and that no credit therefor was allowed to McAnulty; and (3) that Lema admitted he had sold 400 or 500 trees at $2.00 each, for which McAnulty was not given credit. In the memorandum opinion the court said that it was reasonable to assume that, even in the condition described by the witnesses, the trees were worth at least 50 cents each and that that amount could have been obtained had the buyer made any effort to sell them, and that therefore 50 cents should be allowed on each of the 3,500 culls. Appellant contends that there is no evidence to show that the trees were worth but 50 cents a piece.

As to the first claim, when this subject was presented to the court, on motion for new trial, the judge remarked that he had the alternative of finding the trees to be worthless, which, he said, was borne out by plaintiff's testimony, or to find that they were worth something. He chose the latter, because there was a market for Christmas trees. Having no evidence as to what a Christmas tree cull is worth, he chose

to allow the 50-cent figure. The fact that the court allowed such a trifling amount as the possible retail price of Christmas trees shows that the court regarded the trees as virtually worthless. ██ As to the second of these claims, we think the seller is not entitled to a deduction for the normal amount of carry-over. Nothing was allowed in the judgment for loss of profits, and cross-defendant's recovery has been limited to refund of purchase price plus haulage expenses. The normal carry-over which a retailer would expect when buying trees, he would expect to be made up by profits on trees actually sold. ██ As to the third of these, we believe appellant is correct in his claim that he is entitled to a credit. He asserts that he is entitled to a credit of $2.00 for the trees actually sold by Lema. However, he has already been given credit for 50 cents per tree, including those that were sold. There is evidence that salable trees, as might be expected, sold for more than $2.00, the amount claimed by appellant. Therefore, an additional credit of $1.50 for each of the 400 trees should be allowed in favor of appellant.

Judgment is modified by reducing the award to cross-complainant by the sum of $600, and otherwise affirmed. All purported appeals from orders made before judgment are dismissed. Each party shall bear his own costs on appeal.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied February 27, 1962, and appellant's petition for a hearing by the Supreme Court was denied April 3, 1962.